**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

| | |
|---|---|
| | * |
| **BONNIE A. JONES,** | * |
| | * |
| **Plaintiff,** | * |
| | * |
| | *    **CIVIL ACTION NO:** |
| **v.** | *    **3:22-CV-10417-MGM** |
| | * |
| **BAYSTATE HEALTH, INC., et al.** | * |
| | * |
| **Defendants.** | * |

_____*

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO THE DEFENDANTS' MOTION TO DISMISS**

## I.      PRELIMINARY STATEMENT

A credible defendant moving to dismiss under Rule 12(b)(6) accurately and fully recites all material factual allegations set forth in the complaint, affords plaintiff all required favorable inferences, and accurately states the law concerning the elements of a viable claim.  Baystate has done none of these things.  Baystate has cherry-picked the plaintiff's factual allegation and ignored others.  For example, the complaint clearly assert that Baystate's emergency room staff had "actual knowledge" that the plaintiff had an emergency medical condition requiring stabilization.  (First Amended Complaint at ¶s 60-61).  Yet, Baystate argues that no such allegation was made.  To make matters worse, Baystate disregards and contradicts First Circuit case law that mandates the denial of its motion to dismiss on several of the plaintiff's claims.

Every defendant is entitled to a vigorous defense, including the credible use of available pre-discovery procedures to challenge the legal viability of the plaintiff's claims. Here, however, Baystate's utterly frivolous arguments proffered in support of its motion constitute an abuse of the Rule 12(b)(6) process. *Kace v. Liang,* 472 Mass. 630, 640 (2015)("The overarching obligation to

conduct litigation with fairness and integrity" requires that counsel's "zealous advocacy" be used only "as a means of achieving the court's ultimate goal, which is finding the truth")

## II.    STANDARD OF REVIEW

In *Maddison v. City of Northampton,* 533 F.Supp.3d 39 (D.Mass. 2021), this Court set forth the oft-stated standard for resolving a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.  A complaint survives a motion to dismiss if it states a claim to relief that is "plausible on its face." *Id.* at 43. The "plausibility" standard, in turn, is informed by the pleading requirements of Rule 8(a)(2), requiring a "short and plain statement of the claim showing that the pleader is entitled to relief." *Id.*  Extensive factual detail or elaboration of a claim is not required: "[a] short and plain statement needs only enough detail to provide a defendant with fair notice of what the claim is and the grounds upon which it rests." *Id.*

The liberality of this standard is not limitless.  "[A] complaint must contain enough factual material to raise a right to relief above the speculative level on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Id.*  All factual allegations setting out "who said or did what, to whom, and when" must be accepted as true and all reasonable inferences from those facts must be drawn in the plaintiff's favor. *Id.*

## III.    THE PLAINIFF'S FACTUAL ALLEGATIONS

The factual allegations relevant to Baystate's motion are set forth in paragraphs 7-40 of the plaintiff's First Amended Complaint.  To avoid redundancy, those allegations will not be re-stated here.  In summary, the plaintiff, a black woman, arrived at the Baystate emergency room (ER) at 2:15 p.m. suffering from excruciating abdominal stomach pain, nausea, and a bloated stomach. While at the ER, the plaintiff began to sweat and vomit fecal matter.  She and her friend, a black woman, that accompanied her to the ER, explained that the plaintiff had not defecated or passed

gas for two days, had no appetite, and likely had a bowel obstruction. The ER staff told her to wait in the waiting room, expressing on several occasions that nothing was wrong with the plaintiff, that she was "on drugs", and that she was experiencing drug withdrawal and needed to be "watched". (First Amended Complaint at ¶s 10, 16, 26, 30). After waiting over four hours and ignored by the ER staff that was "too busy" to evaluate her, the plaintiff told the staff that she would seek treatment elsewhere if they would not treat her. The ER staff responded by telling her to leave and come back tomorrow.

The plaintiff intended to have her friend drive her to Mercy Hospital but decided to first return home to change her soiled clothes. While at home, she passed out and was taken by ambulance back to Baystate, pleading with the EMTs not to take her there. When the plaintiff arrived at Baystate at 8:00 p.m., she was not screened or treated for her emergency medical condition. A staff member stated that the plaintiff was here earlier in the day and is "going through withdrawals." (First Amended Complaint at ¶ 26). The ER staff told the plaintiff that she was "on the list", nothing was wrong with her, and directed her back to the waiting room—even though the plaintiff's condition had worsened, and she was now experiencing sweats, severe cramping, tremors, and passing in and out of consciousness. (Id. at ¶s 24-26, 30).

Baystate first screened the plaintiff at 12:30 a.m. on December 13, 2019, four and one-half hours after she returned to the hospital and ten hours after she first arrived at 2:15 p.m. the previous day. CT imaging revealed that she had a bowel obstruction. At 4:30 a.m. on December 13, the plaintiff underwent emergency surgery to remove the obstruction.[1]

---

[1] Baystate's incorrect recitation of the allegations in the Amended Complaint include the statement in its brief that the plaintiff "was escorted to an examining room" after her encounter with the phlebotomist in the waiting room. (Baystate's Brief: Doc. 11, at p. 2). This is incorrect. The plaintiff alleges that after her encounter with the phlebotomist, the phlebotomist escorted "another patient" into an examining room. (First Amended Complaint at ¶ 17).

## IV.    ARGUMENT

### 1.    <u>The Plaintiff Has Specifically And Unequivocally Alleged That Baystate's Emergency Room Staff Knew That The Plaintiff Had An Emergency Medical Condition, Triggering Baystate's Obligation To Stabilize Her Condition.</u>

Baystate accurately states the law in this Circuit that an EMTALA claim asserting a failure to stabilize an emergency room patient requires proof that the hospital had actual knowledge that the patient had an emergency medical condition. Baystate asserts that the plaintiff's amended complaint fails to assert a viable stabilization claim because it does not allege that the hospital staff had such knowledge. (Baystate's Brief: Doc. 11, at 9 & n.4). This simply is not true. In paragraphs 60 and 61 of the Amended Complaint asserting a failure to stabilize, the plaintiff alleges that:

> 60.     Baystate, by and through its employees and agents, *knew that Plaintiff had an emergency medical condition* manifested by symptoms of severe, debilitating abdominal pain, vomiting of feces, constipation, cramps, tremors, and severe sweating indicative of a bowel obstruction, all of which Baystate's staff observed while Plaintiff was in the waiting room. Plaintiff and Ms. Waterman had informed Baystate's medical staff that these symptoms existed and that Plaintiff had not been able to hold down food or water for several days, was experiencing severe abdominal pain, was vomiting feces through her nose and mouth, and that they believed she likely had a bowel obstruction.

> 61.     *Despite Baystate's actual knowledge of the plaintiff's emergency medical condition*, its staff failed to examine, screen, or treat her, to stabilize her condition, or to transfer or help her get to another facility.

Baystate inexplicably and inexcusably ignores these specific and clear factual allegations that refute its arguments. Such a blatant disregard of a litigant's Rule 12(b)(6) obligation to fully and accurately present to the court the complaint's factual allegations should not be tolerated.[2]

---

[2] After filing her complaint, the plaintiff received her certified medical records from Baystate stating that at 2:35 p.m. on December 12, 2019, the ER staff assigned her an emergency department "Tracking Acuity 2." on a scale of 1 to 4, with 1 being the most severe emergency. An Acuity 2 rating is commonly defined as an unstable condition requiring that the patient be seen by a physician within ten minutes and receive radiological testing. On May 13, 2022, the plaintiff filed her Second Amendment Complaint within 21 days after the filing of Baystate's motion to include this factual allegation. Although the question is somewhat unclear, a motion to amend was not, in the plaintiff's view, required under Rule 15(a)(2) because the amended complaint was filed in Superior Court before removal to this Court. If the plaintiff is incorrect, she requests leave to file a motion to amend. Even without this amendment, however, this Court should consider the medical records as part of the First Amended Complaint because the authenticity of those records is unquestionable. *Maddison v. City of Northampton,* 533 F.Supp.3d 39, 43 (D.Mass. 2021).

**2.** **The Amended Complaint Sufficiently Alleges That The Plaintiff Was Constructively Discharged, Triggering Baystate's Stabilization Obligation.**

Baystate is correct that, under First Circuit law, a hospital cannot be liable for failing to stabilize a patient unless the hospital discharges the patient or transfers her to another hospital. *See, e.g., Alvarez-Torres v. Ryder Memorial Hosp.,* 582 F.3d 51, 52 (1ˢᵗ Cir. 2000). These cases have reasoned that holding a hospital liable under EMTALA for failing to stabilize a patient while the patient remains at the hospital is akin to a medical malpractice claim for which EMATLA provides no cause of action. *Id.* Based on these general precepts, Baystate argues that the plaintiff's stabilization claim fails because she was not "transferred" or "discharged" from the ER. According to Baystate, a hospital's decision, after providing a modicum of attention to a patient's condition, to overtly discharge or transfer a medically unstable patient is actionable, but a hospital's failure to provide *any* treatment, forcing an ill patient to seek treatment elsewhere is not.

This flawed interpretation ignores First Circuit law embracing the concept of constructive discharge. This occurs when a hospital turns away a patient suffering from an emergency condition by making the patient endure her pain and risk of severe harm for a long period of time, forcing the patient to leave the hospital to seek care elsewhere. Here, the plaintiff has alleged that after (1) waiting over four hours in excruciating abdominal pain accompanied by the vomiting of fecal matter; (2) being told by Baystate's medical staff that nothing was wrong with her; and (3) being falsely accused by the staff that she was experiencing drug withdrawal, she told the staff that unless she was treated, she would leave to receive emergency care elsewhere. (Plaintiff's First Amended Complaint at ¶s 7-21). The staff responded by bidding her farewell, and telling her to leave and "come back tomorrow." (Plaintiff's First Amended Complaint at ¶ 20).

This is the most severe form of "patient-dumping", the very conduct that EMTALA was intended to prohibit. In Baystate's distorted view of the statute, a "discharge" does not occur when a patient is constrained to leave the ER to seek treatment elsewhere after being left unattended and untreated for over four hours in excruciating pain and vomiting fecal matter.

This Court, like other judges in this Circuit, should reject this fallacious argument. Several courts in this Circuit have held that a "discharge" is not limited to a hospital's overt decision to discharge a patient; but rather, includes the concept of a constructive discharge where a prolonged delay in providing treatment causes the patient to seek treatment elsewhere.

*Correa v. Hosp. San Francisco,* 69 F.3d 1184 (1st Cir. 1995), is the beginning point. There, Carmen Gloria Gonzalez Figueroa (Ms. Gonzalez) was experiencing chest pains, dizziness, chills, and cold sweat. At about 1:00 p.m., her son brought her to the Hospital San Francisco (HSF) and asked the staff to take care of his mother. Ms. Gonzalez was given a number (47) and told to wait. The hospital staff ignored Ms. Gonzalez for approximately two-hours. No longer willing to wait for treatment, Ms. Gonzalez and her daughter, who had relieved her brother, decided to leave HSF and drove to another hospital (Hospmed) for treatment, arriving there between 3:00 and 3:30 p.m. According to the treating doctor, a nurse called from HSF to advise her that the patient would be coming to Hospmed for treatment. At 4:30 p.m., Ms. Gonzalez died at Hospmed. *Id.* at 1189-1190. The jury awarded the family $700,000 on their EMTALA claims against HSF.

On appeal, HSF argued that "it neither denied Ms. Gonzalez an initial screening, nor refused her essential treatment. Its point is that it gave the patient a number and would have ministered to her had she waited." *Id.* at 1193. In other words, the hospital claimed that it did not fail to screen Ms. Gonzalez because she chose to leave the facility and was not transferred or discharged. The First Circuit found this contention to be "spurious." *Id.* The court reasoned that:

[T]he jury … could well have found that HSF never intended to treat the decedent, or, at the least, was itself responsible for truncating her wait. … [W]e think that regardless of motive, a complete failure to attend a patient who presents a condition that practically everyone knows may indicate an immediate and acute threat to life can constitute a denial of an appropriate medical screening examination under section 1395dd(a). … [W]e agree with the court below that the jury could rationally conclude, absent any explanation or mitigating circumstances, that the Hospital's inaction here amounted to a deliberate denial of screening. *EMTALA should be read to proscribe both actual and constructive dumping of patients.*

*Id.* at 1193 (emphasis added).

In *Cintron v. Pavia Hato Rey Hosp.,* 2008 WL 11357813 (D.P.R., July 10, 2008), the district court judge ruled that the constructive discharge concept recognized in *Correa* on a screening claim applies equally to an EMTALA stabilization claim.  In *Cintron,* a patient arrived at the hospital's emergency room at 2:16 p.m. suffering from an overdose of prescribed medication.  At approximately 4:00 p.m., a physical examination was performed and a basic work-up, including blood count, basic metabolic panel, urinalysis, and arterial blood gases, was ordered.  The attending physician concluded that the overdose was a suicide attempt. Seven hours later, the patient, who remained under the hospital's care but was not provided any further treatment, died.

The hospital argued on summary judgment that it could not be held liable for failing to stabilize the patient because "EMTALA applies only in the context of patients who are discharged or transferred to another hospital", and not when a patient remains at the hospital.  *Id.* at *2.  The court disagreed, noting that the thrust of the plaintiff's claim was that the patient "was deserted in the ER, unmonitored and untreated until his demise."  *Id.*  The court stated that:

Even though "constructive dumping" in <u>Correa</u> was limited to that case's facts (an EMTALA-screening action), we see no reason why the Court's rationale should not apply to a stabilization action … The basic purpose of the 'constructive dumping' concept is to impede hospitals from abandoning patients *within their own facilities* in order to escape EMTALA liability. These cases preclude PAVIA's argument that it is immune from EMTALA if Pavía deserted the patient in its own hospital.  Plaintiff, therefore, correctly alleges that "constructive dumping" is applicable under EMTALA.

*Id.* at *3 (emphasis added).

In *Malave Sastre v. Hospital Doctor's Center, Inc.,* 93 F.Supp.2d 105 (D.P.R. 2000), the district court applied the constructive discharge principle to a patient who voluntarily leaves a hospital after being ignored for a prolonged period of time.  In that case, a patient arrived at the hospital emergency room at 1:15 p.m. for treatment of an injury to her right leg sustained in a car accident. At 4:00 p.m., the attending physician, realizing that the patient was suffering an emergency medical condition, moved her to an operating room.  The ER staff then applied a posterior splint cast to her leg.  As of 9:30 p.m., the patient received no further treatment as the attending physician left her to treat other patients.  At that time, the patient's husband, realizing that his wife was not being treated, voluntarily decided to take her to another hospital.  When the patient arrived at the other hospital, she complained of hot fluids running along her leg.  The cast was removed, revealing severe burns caused by its improper placement  *Id.* at 107.

The hospital argued on a motion to dismiss that the plaintiff's stabilization claim failed as a matter of law because she was not discharged or transferred from the hospital and voluntarily left the hospital.  *Id.* at 110.  The court rejected this argument:

> The Court disagrees with the hospital's proposition that it is somehow excused from liability by simply having a patient voluntarily sign herself out after waiting several hours to receive treatment. The First Circuit in *Correa* stated that 'EMTALA should be read to proscribe both actual and constructive dumping of patients.' *Correa* 69 F.3d at 1194. Although a hospital cannot be expected to treat patients simultaneously, it is a question of fact whether the hospital's actions or inactions constituted a constructive discharge.

> *Id.* at 110-111

*Brady v. Weeks Medical Center,* 2019 WL 6529870 (D.N.H., Nov. 12, 2019), follows the same path as *Cintron* and ***Malave Sastre.***  In ***Brady,*** the plaintiff, a black male, arrived at the hospital's emergency room suffering from severe sciatic nerve pain causing him to collapse on the floor.  The hospital refused to treat him and called the police to remove him from the emergency room.  The police officer accused the plaintiff of faking his condition.  The plaintiff's friend then took him to

another hospital for treatment of his sciatic pain.  Although the hospital failed to discharge or transfer him to another hospital, the court ruled—without specifically referring to a constructive discharge by name—that the plaintiff's claim that the hospital violated the stabilization provisions of EMTAL survived the hospital's motion to dismiss.  *Id.* at *3.

The courts in this Circuit recognize that the "transfer" or "discharge" language was not intended to allow hospitals to avoid EMTALA liability by accepting a patient, telling her to wait, and then ignoring her condition and pain for a prolonged period, constraining the patient to leave the hospital and seek medical care elsewhere. These courts have embraced the constructive discharge concept because it advances **the purpose of EMTALA to ensure that** a hospital provides stabilizing treatment to any individual who enters its doors suffering from a known emergency medical condition.  Baystate's failure to cite any of the First Circuit cases applying the constructive discharge concept is a dereliction of its obligation to bring to the court's attention contrary authority relevant to its arguments.

Here, the plaintiff has sufficiently alleged facts supporting a constructive discharge and, indeed, those facts present a particularly compelling case.

- The plaintiff arrived at the Baystate ER at 2:15 p.m. suffering from excruciating abdominal stomach pain, nausea, and bloated stomach.

- While at the ER, the plaintiff began to sweat and vomit fecal matter.  She and her friend, who accompanied her to the ER, explained to the ER staff that the plaintiff had not defecated or passed gas for two days and had no appetite and likely had a bowel obstruction.

- The ER staff told her to wait in the waiting room, expressing on several occasions that nothing was wrong with her, that she was "on drugs", and that she was experiencing drug withdrawal and needed to be "watched". After waiting over four hours and ignored by the ER staff that was "too busy" to treat her, the plaintiff told the ER staff that unless she was treated, she would leave the hospital to seek treatment elsewhere. The ER staff complied, saying that she should leave and come back tomorrow.

(First Amended Complaint at ¶s 9-26, 30).

**3.** <u>Count V Of The Amended Complaint Sufficiently Alleges A Plausible Claim Of Discrimination Under 42 U.S.C. § 1981.</u>

Baystate once again ignores settled law when arguing that the failure of the Amended Complaint to allege an existing "operative contract" or to set forth a "plausible contract" warrants dismissal of its civil right claim under 42 U.S.C. § 1981. According to Baystate, a viable claim for discrimination under § 1981 arises only when the plaintiff and defendant consummate a contract and the discriminatory acts occur during its performance. This is plainly wrong.

The Supreme Court has always interpreted 42 U.S.C. § 1981 as prohibiting conduct that impedes a person's right to *make* a contract and as not applying to conduct occurring after the formation of a contract. *Garrett v. Tandy Corp.,* 295 F.3d 94, 98 (1st Cir. 2002). The First Circuit has held that liability under § 1981 extends to "those situations in which a merchant, acting out of racial animus, impedes a customer's ability to *enter into*, or enjoy the benefits of, a contractual relationship." *Id.* at 100. Thus, if a defendant "refuses, on race-based grounds, to permit a customer to purchase its wares" where the customer contemplated a purchase, the statute applies. *Id.* at 101. The more questionable cases are those where a contract for service was actually made and the alleged discrimination is some way relates to the performance of that contract. *Id.* See *Touma v. General Counsel of Regents,* 2017 WL 10541005, at *6 (C.D.Cal., Dec. 13, 2017)(although complaint failed to set forth a claim under § 1981 where the plaintiff was able to make a contract with the hospital's emergency room, but was dissatisfied with the care she received, the court granted leave to amend to assert that she *attempted* to make a contract for certain medical services and was denied due to her race). Thus, Baystate has it up-side-down: impeding someone from *making* a contract is clearly actionable, while a claim relating to discriminatory conduct *after* a contract is formed may not be.

Here, the plaintiff specifically alleges that when she entered the emergency room she intended to receive—and expressly requested—medical services for her condition on several occasions. (First Amended Complaint at ¶s 9, 12, 14, 19, 20, 24, 26, 28, 34, 48). There was an implicit understanding that Baystate would receive payment for those services from her or her insurance provider.  In the usual course, the plaintiff presumably would have been presented with a consent to treatment form with provisions concerning the patient's obligation to pay for that treatment. The First Amended Complaint alleges that Baystate denied the plaintiff's right to make a contract for medical services based upon her race, forcing her to leave the hospital without receiving medical care.  (First Amended Complaint at ¶ 82).  This situation is no different than when a black woman enters a store's lunch counter intending to purchase food, is denied service because of her race, and leaves the store without making a purchase.  Although a contract was never made, § 1981 liability arises because the defendant denied the patron the opportunity to make a contract.

Dismissal of Count V is unwarranted for a second reason.  Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence and to the full equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white people … ."  The First Circuit has held that § 1981 protects against non-contract related discrimination by protecting citizens against private impairment of the "full and equal benefits" of the law.  *Mahone v. Waddle,* 564 F.2d 1018, 1028 (1st Cir. 1977)("a natural and common sense reading of the statute compels the conclusion that section 1981 has broad applicability beyond the mere right to contract" based upon the "full and equal benefits" clause).

The plaintiff has alleged that:

- Under 42 U.S.C. § 1981, African-American citizens of the United States have the same right in every State to make and enforce contracts *and* the equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white citizens.  (First Amended Complaint, at ¶78) (emphasis added).

- The plaintiff, an African-American woman, is a member of a racial minority.  (Id. at ¶ 79).

- Baystate and the Doe defendants violated § 1981 when they denied Plaintiff timely and appropriate emergency medical evaluation and treatment because of her race.  (Id. at ¶s 80).

- Baystate and the Doe defendants discriminated against Plaintiff on the basis of race, evidenced by the accusation that she was "on drugs" and was "withdrawing", their unsupported claim that her symptoms were caused by her drug use, and their failure to provide Plaintiff with prompt treatment for her condition, while timely treating the conditions of other patients in the ER, and by turning Plaintiff away.  (Id. at ¶ 81).

The Amended Complaint makes specific reference to both the "making contracts" clause and the "full and equal benefits clause."  It is further alleged that the plaintiff was discriminated against based on her race, was treated differently than other patients, and was turned away because of her race.  (Plaintiff's Complaint at ¶s 19, 53, 64, 80-81).  Baystate does not argue—not could it—that the "full and equal benefits" portion of Count V does not assert a plausible claim of racial discrimination.[3]

### 4.  The Factual Allegations In The Plaintiff's First Amended Complaint Sufficiently Set Forth A Plausible Claim Of Racial Animus Or Intent To Discriminate.

The plaintiff has brought four racial discrimination claims: Count IV: civil rights violation under 42 U.S.C. § 2000d; Count V: civil rights violation under 43 U.S.C. § 1981; Count VI: violation of the Massachusetts Public Accommodation Statute, G.L. c. 272, § 98; and Count VII: violation of equal rights under G.L. c. 93, § 102.  Each of these claims requires a plaintiff to allege facts supporting a plausible claim of an intent to discriminate.  The following facts, all previously

---

[3] The plaintiff anticipates that Baystate may argue, incorrectly, that the Amended Complaint does not clearly allege a violation of the full and equal benefits clause of § 1981.  Out of an abundance of caution, the plaintiff has filed a Second Amended Complaint that more definitively asserts a claim under the full and equal benefits clause.  See note 2, *supra*.

discussed and cited above when addressing other counts, are sufficient to set forth a claim of an intent to discriminate or racial animus:

- The plaintiff is a black woman.

- Her friend that accompanied her to the emergency room was a black woman.

- Numerous other patients in the ER were treated and discharged from the hospital before the plaintiff received any medical screening, treatment, or stabilization.

- An ER nurse stated that the plaintiff was withdrawing from drug use and should be watched.

- In the ER waiting room, the phlebotomist stated that, "do you want me to do this or not. You're probably on drugs and you're not going to see the doctor until we get a blood test."

- When the plaintiff returned to the Baystate ER by ambulance, the phlebotomist told a nurse that, "Oh no she was here earlier and returned by ambulance" and that "she has to sit in the waiting room and start over because she's going through withdrawals."

- A member of the ER staff stated to another patient that the plaintiff was not ill.

Baystate concludes that its conduct and statement about the plaintiff abusing drugs, withdrawing, and pretending to be ill "do not permit any rational inference of intentional discrimination based on race." (Document 11, at p. 13). Baystate offers no authority to support its argument. Baystate's assertion that there was no racial animus because it says so constitutes classic *ipse dixit* that, of course, fails to support its position.

Baystate's argument ignores the unfortunate societal reality that black people have been historically stereotyped or profiled as being associated with drug abuse or addiction based solely on their race. This is true to this day. Many courts have recognized this ugly truth.

In *Harden v. Hillman,* 993 F.3d 465 (6th Cir. 2021), the plaintiff, a black man, brought a civil rights claim against a police officer under 42 U.S.C. § 1983, alleging that he was subjected to excessive force. The jury returned a verdict in favor of the defendant. Post-verdict, a juror

submitted an affidavit stating that other jurors made comments accusing the plaintiff of being "a crack addict, and that his intent was to start trouble with Officer Hillman so he could sue the police department and get some money"; that the plaintiff "was taking dope or drinking during breaks in the trial"; that the plaintiff was labeled a 'crack head' and 'an alcoholic' by members of the jury, and that the plaintiff's romantic partner looked like he was "on heroin."  *Id.* at 482.

Finding that these comments were riddled with racial animus, the court ordered a new trial.  In so holding, the Sixth Circuit acknowledged the existing and historical characterizations of black people as drug abusers and that statements concerning this characterization are racially motivated:

> Little needs to be said about the pervasive and harmful racial stereotypes regarding African Americans and drugs, and specifically, crack cocaine. Over one hundred years ago, advocates for the "[t]he Harrison Narcotic Drug Act, America's first comprehensive anti-drug legislation," gathered support by using "blatant racial politics."  For example, during his speech to Congress, Dr. Hamilton Wright warned that 'the use of cocaine by the negroes of the South is one of the most elusive and troublesome questions which confront the enforcement of the law in most of the Southern states.  During the Act's passage, Congress quoted a 1910 report by Dr. Wright to the International Opium Commission which stated that cocaine was a potent incentive in driving humbler negroes all over the country to abnormal crimes.' Thus, Dr. Wright's report 'helped to create the stereotype of the black man as a drug addict.' [internal citations to scholarly sources omitted].
>
> In the mid-1980s, there was a strategic effort to build public and legislative support for the War on Drugs. As a result, 'the media was saturated with images of black 'crack whores,' 'crack dealers,' and 'crack babies,'—images that seemed to confirm the worst negative racial stereotypes about impoverished inner-city residents.' *Id.*; *see also* David A. Sklansky, *Cocaine, Race, and Equal Protection*, 47 STAN. L. REV. 1283, 1293 (1995)(explaining that "[w]hites strongly associated crack with the same minority group they linked with heroin—inner city blacks."). 'The media bonanza inspired by the ... campaign solidified in the public imagination the image of the black drug criminal.' *Id.* at 105. … For example, although African Americans constitute only 15 percent of drug users, in a study that asked participants to close their eyes and 'envision a drug user, ... [n]inety-five percent of respondents pictured a black drug user.'

*Id.* at 482-483.

These engrained stereotypes, when expressed in words, can form the basis of an inference of racial animus and intent to discriminate.  In the First Circuit, "unlawful discrimination can stem

from *stereotypes and other types of cognitive biases,* as well as from conscious animus." *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 59 (1st Cir.1999)(emphasis added in part).  In a discrimination case, "[t]he ultimate question is whether the [plaintiff] has been treated disparately 'because of race.'  This is so regardless of whether the [defendant] consciously intended to base the evaluations on race, or simply did so because of unthinking stereotypes or bias." *Id.* at 58.  Discrimination based on race "focuses on causality rather than conscious motivations, since 'unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination.'" *Id.* at 60.  *See Students for Fair Admissions, Inc. v. President and Fellows of Harvard College,* 980 F.3d 157, 197 (1st Cir. 2020)(the First Circuit applied *Thomas's* acknowledgement of unconscious racial discrimination based on ingrained stereotypes to a civil rights action under 42 U.S.C § 2000d (Title VI)).  *See also Robinson v. Polaroid Corp.,* 732 F.2d 1010, 1015 (1st Cir.1984)(noting that plaintiffs in a disparate treatment case can challenge "subjective evaluations which could easily mask covert or unconscious race discrimination on the part of predominantly white managers"); *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 179 (1st Cir.)(permitting a challenge to a decision process in which "bias may often be unconscious and unexpressed"), *vacated on other grounds,* 439 U.S. 24, *aff'd after remand,* 604 F.2d 106, 114 (1st Cir.1979).

Here, the Baystate ER staff's comments expressed a racial stereotype associating black people with drug abuse.  Because of these prevailing racial stereotypes, the staff's comments give rise to a plausible claim that they acted with racial animus or an intent to discriminate, regardless of whether the staff member uttered the words while consciously and overtly harboring racial animus or, instead, covertly expressing "unthinking stereotypes or bias." *Thomas v. Eastman Kodak Co., supra* at 42. *See Brady v. Weeks Medical Center,* 2019 WL 6529870, at *4 (D.N.H., Nov. 12,

2019)(plaintiff's complaint alleging he was denied emergency room treatment because of race under Title VI survived a motion to dismiss where he alleged that he was African American, that the hospital refused to treat him, and ejected him from the ER because of his race without any allegation of racially derogatory or stereotypical comments).

5.  **The Allegations In Count VIII Of The First Amended Complaint Sufficiently Support A Plausible Claim That Baystate Violated The Massachusetts Civil Rights Act.**

A violation of civil rights under the Massachusetts Civil Rights Act (MCRA) must be based upon threats, intimidation, or coercion that causes a person to refrain from exercising a right. *Thomas v. Harrington,* 909 F.3d 483, 492 (1st Cir. 2018). While threats and intimidation usually require actual or threatened physical force, coercion is a broader concept consisting of "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Planned Parenthood League of Massachusetts, Inc. v. Blake,* 417 Mass. 467, 474 (1994).  To prevail on a MCRA claim, the plaintiff need not prove that the defendant harbored a specific intent to deprive someone of a right, but merely that the acts complained of would have a natural threatening, intimidating, or coercive effect. *Reproductive Rights Network v. President of the Univ. of Mass.,* 45 Mass.App.Ct. 495, 508 (1998).

In the context of this case, the key inquiry is whether a factfinder could reasonably infer that the defendant's' actions had the effect of dissuading the plaintiff from seeking the immediate care and treatment to which she was statutorily entitled.  *Planned Parenthood, supra* at 475.  The analysis here is not complicated or far-reaching.  The plaintiff arrived at the Baystate ER seeking emergency care for her excruciating abdominal pain accompanied by lack of appetite, nausea, a bloated stomach, constipation, and an inability to hold down any food or water or pass gas. (Amended Complaint at ¶ 7).  The plaintiff would not have left the Baystate ER unless she was constrained to do so against her will by the ER staff's racially charged comments that she was not

truly ill, was probably on drugs, was "withdrawing" from her illicit drug use, was uncooperative, and that the ER was "too busy" to treat her. When the plaintiff told the ER staff that she was leaving to seek treatment elsewhere, they acquiesced and told her to come back tomorrow, assuming perhaps that her alleged withdrawal symptoms would abate.

The clear and inherently coercive and intimidating message conveyed was that the plaintiff did not need medical care, that her symptoms were caused by her own illicit drug use, she was not welcome in the ER, was not worthy of medical treatment, and that she should leave the ER. Drawing all reasonable inference in favor of the plaintiff, Baystate's conduct and racially offensive comments constrained the plaintiff do something against her will that she would not have otherwise done; namely, to leave the ER despite her worsening condition manifested by vomiting of feces and slipping in and out of consciousness. *See Withrow v. Clarke,* 2008 WL 8188363, at *10 (D.Mass., Aug. 18, 2008)(the writing of the words "nigger" and "Dan you spook" and the drawing of a swastika on a college dormitory room door constituted intimidation and threats under the MCRA because "they are all offensive as well as racist and have no other purpose other than the expression of racial animus").

6. **The Allegations In Count X Of The Amended Complaint Set Forth A Plausible Claim For Relief Under G.L. c. 93A, §§ 2 And 9.**

In a profound oversimplification of the application of Chapter 93A to claims against a hospital, Baystate argues that "medical care related services are outside the scope of 93A." (Document 11, at p. 19). This vague characterization of the scope of c. 93A begs the question: what type of "medical services" are or are not within the scope of c. 93A?

*Darviris v. Petros,* 442 Mass. 274 (2004), provides the answer. Claims asserting medical negligence or malpractice in the providing of medical care are not within c. 93A's scope, while other claims brought under consumer protection statutes may be applied to the entrepreneurial and

17

business aspects of providing medical services. *Id.* at 279.  In this case, the application of this dichotomy is relatively simple. Despite Baystate's far-reaching effort to convert plaintiff's EMTALA and discrimination claims into a medical malpractice claim—they are not.  The relief available to a patient under EMTALA is not grounded in medical malpractice; rather, it provides a statutory prohibition against "dumping" or turning away patients seeking emergency medical care. *Correa v. Hospital of San Francisco,* 69 F.3d 1184, 1192-1193 (1st Cir. 1995). This transgression happens *before* medical treatment occurs.  In this sense, EMTALA provides a remedy for patients who are denied access to emergency care that a hospital is in the business of providing. Thus, Baystate badly misinterprets the *Daviris* holding as barring the plaintiff's c. 93A claim as a matter of law.

As the *Daviris* court acknowledged, 940 Code Mass. Regs. § 3.16(3), promulgated by the Attorney General pursuant to c. 93A, states, in relevant part, that "an act or practice is a violation of [G.L. c. 93A] if ... [i]t fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare ..." (emphasis added).  Obviously, the discrimination statutes and EMTALA on which the plaintiff's claims are based are meant to protect the public's health, safety, and welfare.  This is enough to withstand Baystate's motion to dismiss, and Baystate does not argue to the contrary. *See Daviris, supra* at 282, n.9 ("the regulation, which states that violations of G.L. c. 93A include any failure to 'comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare,' could be interpreted to include a violation of any statute in the Commonwealth").

**7.** **Count VI Of The Amended Complaint Sets Forth A Viable Claim For Violation Of The Massachusetts Public Accommodation Statute.**

A. The Plaintiff Was Not Required To Exhaust Her Administrative Remedies With The Massachusetts Commission Against Discrimination (MCAD) Before Commencing Suit.

In *CapoDiCasa v. Town of Ware,* 2018 WL 3966303, at *3-5 (D.Mass., Aug. 17, 2018)(Mastroianni, J), a case involving the plaintiff's arrest by a police officer, this Court ruled that a plaintiff is not required to exhaust her administrative remedies by filing a charge with the MCAD before commencing an action under the Massachusetts Public Accommodations Statute, G.L. c. 272, § 98.  Baystate fails to cite and address this Court's ruling in *CapoDiCasa. See Peters v. Boston Properties, Inc.,* 2021 WL 34939037, at *3-4 (Mass.Sup.Ct., June 15, 2021)(adopting the reasoning of *CapoDiCasa,* the court ruled that a plaintiff who alleged wrongful expulsion from a mall was not required to exhaust her administrative remedies with the MCAD before commencing a lawsuit under the Massachusetts public accommodation statute).

B. A Hospital Is A Place Of Public Accommodation.

Under G.L. c. 272, § 92A a place of "public accommodation … shall be deemed to include "any place, … which is open to and accepts or solicits the patronage of the general public."  The statute then provides specific examples "without limiting the generality of this definition."  One of those examples is a "hospital … for profit."  Baystate latches onto this example, while ignoring the general definition.

Once again, Baystate ignores the case law.  "The enumerated specific examples of 'places of public accommodation' do not restrict the preceding general statutory language or provide a basis for applying the principle of ejusdem generis." *Local Fin. Co. of Rockland v. Massachusetts Comm'n Against Discrimination,* 355 Mass. 10, 12-13 (1968). *See Currier v. National Bd. of Medical Examiners,* 462 Mass. 1, 18 (2012)("the enumerated specific examples of places of

accommodation do not restrict the preceding general statutory language.  **Said another way**, the list is nonexclusive").  That private "for profit" hospitals are deemed places of public accommodation under the statute does not in any way support the notion that a public or charitable not-for-profit hospital is not a place of public accommodation.  There is no question that Baystate is a place that is "open to and accepts or solicits the patronage of the general public", and Baystate does not argue otherwise.

8.  <u>**The Allegations In Count IX Of The Amended Complaint Set Forth A Plausible Claim For Intentional Infliction of Emotional Distress.**</u>

What has been stated thus far effectively disposes of Baystate's challenge to the plaintiff's intentional infliction of emotional distress claim.  Let us hope that, at this point in American history, racial animus and discrimination in the denying of emergency medical care constitutes outrageous conduct.  It is a question of fact whether such conduct is "beyond all bounds of decency and utterly intolerable in a civilized community." *Abubarden v. Gross,* 542 F.Supp.3d 69, 78 (D.Mass. 2021(complaint raised reasonable inference of outrageous conduct where police offer arrested the defendant for failing to register his address as a sex offender without checking the records to determine that he had); *Brown  v. Nutter, McLennen & Fish,* 45 Mass. App. Ct. 212, 218-219 (1998)(whether conduct is sufficiently outrageous is a jury question).  Baystate provides no legal support of its argument that this Court should rule as a matter of law that its conduct was not outrageous.  Because Baystate says that its conduct was not outrageous does not make it so. Arguments so barren of meaningful development and legal support deserve summary rejection.

V.      **CONCLUSION**

For all the above reasons, the defendants' motion to dismiss should be denied.


Respectfully submitted,
By her attorneys,

/s/Anthony Tarricone
Anthony Tarricone, BBO #492480
atarricone@kreindler.com
Joseph P. Musacchio, BBO #365270
jmusacchio@kreindler.com
KREINDLER & KREINDLER, LLP
855 Boylston Street
Boston, MA  02116
Telephone:     617.424.9100
Facsimile:      617.424.9120

Dated: May 19, 2022

## CERTIFICATE OF SERVICE

I, Joseph P. Musacchio, certify that this opposition was served on the defendants pursuant to the Court's ECF filing system on May 19, 2022.

/s/ Joseph P. Musacchio